IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ROBBIN CROMER-TYLER, M.D., | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) CASE NO. 1:01-cv-1077-MEF |
| | ) |
| EDWARD R. TEITEL, M.D., P.C., *et al.*, | ) (WO-Not Recommended for Publication) |
| | ) |
| DEFENDANTS. | ) |

**MEMORANDUM OPINION AND ORDER**

This action is brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, et seq.  After weighing the evidence and testimony offered by the parties during a two-day bench trial, the Court finds that judgment is due to be entered in favor of Plaintiff Robbin Cromer-Tyler and against Defendants.  In support of this judgment, the Court makes the following findings of fact and conclusions of law:

**I.  FINDINGS OF FACT**

The Court is satisfied that the credible evidence presented in the trial of this cause supports the following findings of fact:

1.  Plaintiff Robbin Cromer-Tyler, M.D. ("Dr. Cromer-Tyler"), who now works as a general surgeon in California, is a participant in the Edward R. Teitel, M.D., P.C. Money Purchase Pension Plan (the "Plan").

2.  Defendant Edward R. Teitel, M.D. ("Dr. Teitel") is, and has been at all times relevant to the matters at issue in this action, the Plan Administrator for the Plan.

3.  Dr. Cromer-Tyler brings this lawsuit against Dr. Teitel individually and in his capacity as Administrator of the Plan.[1] She seeks judgment against Dr. Teitel requiring him to make an immediate distribution of her entire account balance in the plan.  In addition, Dr. Cromer-Tyler seeks the imposition of civil penalties against Dr. Teitel pursuant to ERISA as a result of Dr. Teitel's failure to provide Dr. Cromer-Tyler with information regarding her rights in the Plan.  Finally, Dr. Cromer-Tyler seeks to recover the attorney's fees and costs she incurred in connection with her attempts to obtain information from Dr. Teitel and in prosecuting this action.[2]

4.  On November 1, 1994, Edward R. Teitel, M.D., P.C. (the "Practice") and Dr. Cromer-Tyler entered into an Employment Agreement.  By the terms of this Employment Agreement, which was, by its terms, to be effective from November 1, 1994 until October 31, 1997, unless terminated earlier, Dr. Cromer-Tyler "may be entitled to participate in any plans, insurance policies or contracts maintained by [the Practice] relating to retirement,

---

[1] Dr. Cromer-Tyler initially brought suit against Edward R. Teitel, M.D., P.C. as well, but at trial she clarified that she was not seeking judgment against Edward R. Teitel, M.D., P.C. and made an oral motion for the dismissal of all claims against Edward R. Teitel, M.D., P.C., which motion the Court granted.  During trial, Dr. Teitel orally moved this Court for sanctions due to Dr. Cromer-Tyler's waiting to file her motion to dismiss the claims against Edward R. Teitel, M.D., P.C.; that motion is DENIED.

[2] While Count III of the Complaint appears to set forth a separate free-standing claim against Defendants for breach of fiduciary duty and Dr. Cromer-Tyler contends that Dr. Teitel breached fiduciary duties owed to Dr. Cromer-Tyler and other Plan participants, at trial she clarified that she was not seeking damages for breach of fiduciary duty because those damages are recoverable only by the Plan.  Instead, she claims that Dr. Teitel's breaches of fiduciary duty are relevant to the other issues before the Court.

health, disability and other related benefits" subject to the provisions of the plans, contracts or policies. The Employment Agreement did provide that the Practice was not under a contractual obligation to initiate or maintain any such plans, policies, or contracts.

     5. Dr. Cromer-Tyler was employed by the Practice as a physician from November 15, 1994 until August 8, 1997. The parties have stipulated that during this time period Dr. Cromer-Tyler became a participant in the Plan and in the Edward R. Teitel, M.D., P.C. Profit Sharing Plan. Dr. Teitel, the sole shareholder of the Practice, established these plans because his accountant advised it and because he was looking for a retirement savings vehicle for himself and his employees.

     6. At all times relevant, Dr. Teitel was the Administrator for the Plan. It was clear to the Court from the testimony at trial that he did not have a good grasp of his responsibilities or legal obligations either under the terms of the Plan itself or under the law prior to the initiation of this lawsuit against him. Indeed, he has admitted that at the time he was "operating the plan" he did not understand that he had any fiduciary duties.

     7. The section of the Defined Contribution Prototype Plan and Trust Agreement (the "Plan Document") addressing the duties and powers of the Plan Administrator states that "The Plan Administrator will have full discretionary authority to decide all questions arising in the administration, interpretation, and application of the Plan and Trust, including all questions relating to eligibility and distributions except as may be reserved under this Plan to the Employer." Pltf.'s Ex. 12 at § 10.3[a].

8. The Plan imposes certain duties upon Dr. Teitel, a fiduciary under the Plan:

> A fiduciary will discharge his duties under the Plan solely in the interest of the Participants and the Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan. All fiduciaries will act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Pltf.'s Ex. 12 at § 9.1.

9. Earlier in this litigation, this Court granted Defendants motion for summary judgment on Dr. Cromer-Tyler's claims relating to the Edward R. Teitel, M.D., P.C. Profit Sharing Plan. The trial in this cause related only to Dr. Cromer-Tyler's claims relating to the Plan.

10. Prior to its dissolution in August of 1998, the Practice was an Alabama corporation, all outstanding shares of which were owned by Dr. Teitel.

11. While employed by the Practice, Dr. Cromer-Tyler worked full-time. During 1995, Dr. Cromer-Tyler worked more than 3,000 hours for the Practice. During 1996, Dr. Cromer-Tyler worked more than 3,000 hours for the Practice. Prior to the termination of her employment in 1997, Dr. Cromer-Tyler worked more than 2,700 hours for the Practice.

12. Dr. Teitel terminated Dr. Cromer-Tyler's employment when she elected not to purchase the Practice from Dr. Teitel as he wished. After the termination of her employment with the Practice in early August of 1997, Dr. Cromer-Tyler set up her own practice. She

hired some of the employees of the Practice.

13.  The credible evidence presented at trial established that at no point prior to the termination of her employment with the Practice did anyone from the Practice talk to Dr. Cromer-Tyler about retirement plans other than a there being some general mention that there was a retirement plan available.  Moreover, the credible evidence presented at trial established that, Dr. Cromer-Tyler received no documents relating to any retirement plan from the Practice prior to the termination of her employment with the Practice.

14.  On September 4, 1997, Dr. Teitel received a letter from his Certified Public Accountant, J. Brent Browning ("Browning"), regarding the possible consequences of not making a 1996 contribution in the Practice's retirement accounts.  The letter states:

> Dear Dr. Teitel,
>
> As per our last meeting, I have projected the consequences of you not making the 1996 retirement contribution.
> To fully fund the plans for 1996, the total contribution would be $75,163 of which $49,163 is still due to be paid as of 9/15/97.
> If you do not fully fund the plan, we will not have the $75,163 deduction which will create on [sic] income tax liability of $19,216.  You will also owe an excess contribution penalty of $2,600 (10% of the $26,000 that has been contributed for 1996 into your plan).
> $60,000 of the $75,163 contribution will go towards the plans of Dr. Teitel, Cindy Teitel, and Dr. Robin[sic] Cromer-Tyler.  *Since Robbin is not vested, the majority of her contribution will end up in your individual plans.*
> *In summary, if you do not make the contribution, $21, 816 will be paid in taxes and penalties.  If you do make the full contribution, the majority of the contribution will be for your personal benefit.*  The contribution will cost you a net amount of

5

> $53,347 (the $75,163 contribution less a $21,816 savings of taxes
> and penalties). Afer Robbin's non-vested portion is redistributed
> you will get more than the $53,347 in your personal accounts.
> If there are any further questions, please so advise.

(emphasis added).

15. Dr. Teitel elected to heed Browning's advice and improve his own financial situation by making the 1996 contributions to the retirement plans on September 25, 2007.

16. About a month after she left her employment with the Practice, Dr. Cromer-Tyler was presented with certain forms relating to the Plan. Other former employees of the Practice also received similar forms. After giving the matter some thought, Dr. Cromer-Tyler completed the following forms: Profit Sharing Plan Participant Information Form; Money Purchase Pension Plan Participant Information Form; and the OLDE Investors Account Application form. Dr. Cromer-Tyler executed these documents on September 16, 1997. The credible evidence presented at trial established that no one from the Practice provided Dr. Cromer-Tyler with information about either of the retirement plans at the time she was presented with these forms.

17. In September of 1997, Dr. Cromer-Tyler began receiving periodic statements from OLDE Discount Corporation ("OLDE"), a company that is apparently a subsidiary of H&R Block,[3] indicating that she was a participant in the Plan. The first statement that she received indicated that she had an account balance in the Plan in the amount of $7,500.00,

---

[3] Eventually, the statements Dr. Cromer-Tyler received came only from H&R Block Financial Advisors.

which, according to the statement, resulted from a deposit of that amount on September 25, 1997.

18.   During the last nine years, Dr. Cromer-Tyler received some of the statements reflecting the activity in her account in the Plan.  At other times, the statements were apparently sent to Dr. Teitel and were not forwarded to Dr. Cromer-Tyler.  As of March 31, 2006, the statement for Dr. Cromer-Tyler's account in the Plan indicated that the account balance was $9,516.26.[4]

19. After Dr. Cromer-Tyler began receiving the statements indicating that she had an account balance in the Plan, she attempted to contact her account representative at OLDE. She was not successful at getting her calls answered.  No one ever told Dr. Cromer-Tyler that she had the right to direct or select investments of funds in the Plan.

20.  In late Spring of 1998, other employees who had worked for the Practice began receiving information as to the procedure for obtaining distributions from the Plan and the dissolution of the Plan. Dr. Cromer-Tyler did not receive this information or any distribution forms.  She was interested in obtaining these same documents.

21.   Dr. Cromer-Tyler contacted an attorney in Ozark, Alabama, Joe Adams ("Adams")  to ask his help to obtain information about the Plan.  Adams contacted OLDE, the custodian of Dr. Cromer-Tyler's account in the Plan, and requested information

---

[4]  This is the most recent statement entered into evidence.

concerning her account in the Plan.

22. After receiving two separate written requests from Adams, OLDE, the custodian of Dr. Cromer-Tyler's account in the Plan, responded to her counsel with a letter dated August 10, 1998, and informed him that he should submit any inquiries about the Plan to Dr. Teitel. OLDE characterized Dr. Teitel as the "director of this plan" and told Adams that as director duties included "keeping the participants of the Plan informed as to their options."

23. The next information Dr. Cromer-Tyler received came to her directly in a letter sent certified mail and dated September 10, 1998 and signed by Dr. Teitel, as President of the Practice.[5] The substantive content of the letter was:

> This letter is to inform you that, as of your termination of service with Edward R. Teitel, M.D., P.C., you had no vested account balance in either the Edward R. Teitel, M.D., P.C. Money Profit Sharing Plan or the Edward R. Teitel, M.D., P.C. Money Purchase Pension Plan (collectively, the "Plans") and therefore, are entitled to no distribution from the Plans.

24. It is now undisputed that according to the terms of the Plan, Dr. Cromer-Tyler was actually 100% vested in the Plan at the time of this letter and that Dr. Teitel was incorrect that she was not entitled to a distribution from the Plan.

25. In informing Dr. Cromer-Tyler that she had no vested account balance in the Plan, Dr. Teitel failed to provide Dr. Cromer-Tyler with the specific reasons that she was not

---

[5] Interestingly, Dr. Teitel elected to address the letter to Dr. Cromer-Tyler from the Practice itself even though the corporate entity that was the Practice had been dissolved prior to the date of this letter.

vested, he failed to provide Dr. Cromer-Tyler with specific references to the relevant Plan provisions, and he failed to explain the Plan's claim review procedure. Moreover, in refusing to distribute Dr. Cromer-Tyler's account balance in the Plan to her, he treated her differently than similarly situated Plan participants, who received distributions of their entire account balances in the Plan. Based on the letter he had received from Browning, Dr. Teitel believed, at the time he wrote Dr. Cromer-Tyler in September of 1998, that he would personally benefit from a determination that Dr. Cromer-Tyler was not vested in her account in the Plan.

26. Because she had never been provided with Plan documents, Dr. Cromer-Tyler had no ability to critically assess Dr. Teitel's erroneous statement that she was not vested.

27. On September 28, 1998, Adams, acting as counsel for Dr. Cromer-Tyler sent a letter to Dr. Teitel and requested that Dr. Teitel provide him with Plan documents. Adams specifically indicated that his letter was in response to Dr. Teitel's statement that she was not vested in the retirement plans and asked for documents setting forth vesting information and Plan requirements.

28. In response to this inquiry, Dr. Teitel's counsel provided certain documents relating to another retirement plan;[6] however, Dr. Teitel did not provide Dr. Cromer-Tyler with documents relating to the Plan at issue in this lawsuit. Specifically, Dr. Teitel did not provide Dr. Cromer-Tyler with the vesting schedule for Dr. Cromer-Tyler's interest in the

---

[6] Specifically, documents were sent regarding the aforementioned Edward R. Teitel, M.D., P.C. Profit Sharing Plan.

Plan. Dr. Teitel's counsel indicated in his cover letter of November 3, 1998 that he was waiting to receive the adoption agreement for the Plan and that he would forward it on to Adams when he received it. A copy of this letter was sent to Dr. Teitel.

29. It was not until well after this litigation was commenced that Dr. Teitel provided Dr. Cromer-Tyler with the vesting schedule for the Plan. This information, which showed that Dr. Cromer-Tyler was 100% vested in the Plan, was attached to a pleading filed by Dr. Teitel on April 21, 2003, more than 4 ½ years after the information had been requested by Dr. Cromer-Tyler's counsel. Indeed, prior to April 21, 2003, no one had ever provided Dr. Cromer-Tyler any document or other information from which she could have determined how to make a claim to the funds in the Plan or determined whether or not she was vested in those funds.

30. During the course of this litigation, Dr. Teitel contacted the custodian which held Dr. Cromer-Tyler's account balance in the Plan and requested that a portion of his attorney's fees incurred in connection with the defense of this lawsuit be paid out of Dr. Cromer-Tyler's account in the Plan.

31. In serving as Administrator of the Plan, Dr. Teitel failed to maintain records concerning the Plan and its operations, including Plan documents, Adoption Agreements, Summary Plan Descriptions, and Annual Reports. At various times, Dr. Teitel failed to provide Dr. Cromer-Tyler with statements reflecting activity in her account in the Plan. In addition, Dr. Teitel failed to maintain a fiduciary bond with respect to the Plan as required

by the Plan documents and ERISA.

32. In addition to serving as Administrator, Dr. Teitel also maintained an account in the Plan. Dr. Teitel self-directed his investments in his account in the Plan; however, it does not appear that he provided other employees with such authority or at least did not inform them that they had such authority.

33. After Dr. Teitel closed his practice, he transferred his account balance in the Plan to another investment broker in November, 1997. However, most of the other participants in the Plan were not provided an opportunity to obtain distributions of their account balances in the Plan until more than one year after the Practice closed, and of course, Dr. Teitel denied Dr. Cromer-Tyler even that opportunity by denying that she was vested.

34. As of September of 2001, Dr. Cromer-Tyler had still had no success in her dealings with Dr. Teitel regarding the Plan. She filed this lawsuit.

35. Following the issuance of this Court's Memorandum Opinion and Order, which allowed Dr. Cromer-Tyler to pursue a claim for benefits relating to the Plan, Dr. Cromer-Tyler did so on August 30, 2006. At that same time, she filed her appeal of the denial of benefits under the Plan. On October 27, 2006, Dr. Teitel issued a decision stating that Dr. Cromer-Tyler's claim for benefits from the Plan would be granted; however, Dr. Teitel conditioned the distribution of her account balance in the Plan upon her execution of "a general and complete release of all claims."

**CONCLUSIONS OF LAW**

1. The Edward R. Teitel, M.D., P.C. Money Purchase Pension Plan (the "Plan") is an employee benefit plan that is subject to and governed by the Employee Retirement Security Act of 1974 ("ERISA") codified at 29 U.S.C. §§ 1001 *et. seq.*

2. Edward R. Teitel ("Dr. Teitel") is and was at all times pertinent to the allegations in this lawsuit the Administrator of the Plan. Pursuant to the Plan documents, as the Plan's Administrator, Dr. Teitel had the full discretionary authority to decide all questions arising in the administration, interpretation, and application of the Plan, including all questions relating to eligibility and distributions. Pursuant to 29 U.S.C. § 1002(21), "a person is a fiduciary with respect to [an ERISA] plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets....or (iii) he has any discretionary authority or discretionary responsibility in the administration of such a plan." As a result, under the terms of the Plan and pursuant to ERISA, Dr. Teitel was a fiduciary and as such he owed a fiduciary duty to all of the participants in the Plan, including Dr. Cromer-Tyler.

3. A review of the Plan documents, including most importantly the adoption agreement for the Plan, reveals that Dr. Cromer-Tyler is and was at all times 100% vested in her account balance in the Plan.

4. Pursuant to 29 U.S.C. §1132(a)(1)(B), Dr. Cromer-Tyler is entitled to receive

a full, complete and ***unqualified***[7] distribution of her entire account balance in the Plan in accordance with her instructions to the Plan Administrator.

5.  A plaintiff may recover plan benefits under 29 U.S.C. § 1132(a)(1)(B) and statutory penalties under 29 U.S.C. § 1132(a)(1)(A) in the same action. The precedents on which Dr. Teitel has relied do not compel a different result. This case does not present the first time a plaintiff has sought both plan benefits under 29 U.S.C. § 1132(a)(1)(B) and statutory penalties under 29 U.S.C. § 1132(a)(1)(A) in the same action. Indeed, this Court has located a number of cases in which such claims co-existed without comment or criticism.

6.  Dr. Teitel is liable for civil penalties under 29 U.S.C. §§ 1132(a)(1)(A) and 1132(c) for his failure to provide Dr. Cromer-Tyler or her counsel with documents relating to the Plan, which were requested by Dr. Cromer-Tyler. The request by Dr. Cromer-Tyler's counsel, on September 28, 1998, included a request for the vesting requirements for the Plan. Had these documents been produced within 30 days as required by the Plan and by ERISA, it would have been readily apparent that Dr. Teitel had no basis for his previous assertion that Dr. Cromer-Tyler was not vested in the Plan. Instead, the requested documents were not produced until more than 4 ½ years later on April 21, 2003, long after this litigation commenced. Pursuant to the above referenced statute and 29 C.F.R. §2575, Dr. Teitel may be subject to a civil monetary penalty of $110 per day for each of the 1,636 days he delayed

---

[7] For example, Dr. Teitel may not insist that Dr. Cromer-Tyler sign a release of her claims to funds in the Edward R. Teitel, M.D, P.C. Profit Sharing Plan and Trust in order to receive this distribution.

in providing these documents, which established Dr. Cromer-Tyler's rights in the Plan.

    7.     Based upon this lengthy delay and the resulting prejudice to Dr. Cromer-Tyler, this Court assesses Dr. Teitel with civil penalties in the amount of $179,960.00 to be paid personally by Dr. Teitel to Dr. Cromer-Tyler.

    8.     In addition to his failure to provide the requested documents regarding the Plan, Dr. Teitel also violated the reporting, disclosure, and notification requirements of ERISA as well as the express terms of the Plan as follows:

        a.     Dr. Teitel failed to maintain and provide the Plan participants with a Summary Plan Description as required by 29 U.S.C. §1021(a); 29 U.S.C. §1022(a) and (b); and 29 U.S.C. §1024(b). In addition, Sections 10.3(c)(2) and 10.3(d) of the Defined Contribution Prototype Plan and Trust Agreement ("the Plan Document") specifically require Dr. Teitel to prepare and make available to all participants a Summary Plan Description;

        b.     Dr. Teitel failed to file, maintain, and provide to Plan participants Annual Reports on the Plan as required by 29 U.S.C. §1023(a); 29 U.S.C. §1024(a); and (b) 29 U.S.C. 1021(b); and 29 U.S.C. §1027. Sections 10.3(c)(2) and 10.3(d) of the Plan Document impose the same requirements upon Dr.

>   Teitel; and
>
>   c.   In contravention of 29 U.S.C. §1112(a) and Section 10.3(f) of the Plan Document, Dr. Teitel failed to obtain a fiduciary bond on himself as Administrator of the Plan.

9. Dr. Teitel breached his fiduciary duties to Dr. Cromer-Tyler in the way he operated the Plan, the manner in which he addressed her efforts to obtain information from the Plan, and in addressing her efforts to obtain a distribution from the Plan. Dr. Teitel's actions in failing to respond to Dr. Cromer-Tyler's request for information and documents from the Plan, his attempts to cut off her rights in the Plan, his disparate treatment of similarly situated participants, and his attempts to charge Dr. Cromer-Tyler's fully-vested account in the Plan for his attorney's fees all support this Court's determination that Dr. Teitel breached his fiduciary duties to Dr. Cromer-Tyler as a participant in the Plan in violation of 29 U.S.C. §1132(a)(2); 29 U.S.C. §1104(a); and 29 U.S.C. §1109(a). This Court also finds that Dr. Teitel breached his fiduciary duty to Dr. Cromer-Tyler when, after finally acknowledging her entitlement to the full distribution of her account balance in the Plan, he refused to distribute her vested benefits until such time as she completely released him from all claims asserted in this lawsuit. Dr. Teitel acted out of self-interest and failed to act in the interest of Dr. Cromer-Tyler and other Plan Participants.

10. While Dr. Teitel's breach of his fiduciary duties to Dr. Cromer-Tyler does not expose him to personal liability to Dr. Cromer-Tyler, it supports this Court's decision to

impose significant statutory penalties and to assess attorney's fees against Dr. Teitel.

11.     Based upon the wrongful conduct of Dr. Teitel and the success of Dr. Cromer-Tyler in this litigation, 29 U.S.C. §1132(g) authorizes the assessment against Dr. Teitel of the reasonable attorney's fees and costs incurred by Dr. Cromer-Tyler in her attempts to obtain information from Dr. Teitel and in prosecuting this action. Dr. Cromer-Tyler has filed a separate motion seeking to recover these fees and that motion will be addressed by a separate Memorandum Opinion and Order.

## CONCLUSION

Consistent with this Memorandum Opinion and Order, the Court will enter a written final judgment in favor of Plaintiff and against Defendants.

DONE this the 11th day of September, 2007.

> /s/ Mark E. Fuller
> CHIEF UNITED STATES DISTRICT JUDGE